Morning. When your case is called, if you're the appellant's counsel, let us know how much time you require for rebuttal. First case may be called. Case number 1582, Richard Kapuscinski v. City of Gibralter, Michigan, et al. Oral argument to be 15 minutes for plaintiffs and 15 minutes to be shared by defendants. Mr. Weglars for the appellant. Good morning. Good morning. I am counsel for plaintiffs. We're the appellant on this case. And before you is a section 1983 civil action involving a fatal taser death of Mr. Kapuscinski. How much time would you like for rebuttal? Your honor, I would The first thing I would like to explain to the judges is that I'm very bothered by this case. If you were to read all of these police records and you hear these statements about what happened to this girlfriend, this victim of Mr. Kapuscinski, you're appalled by it. I'm appalled by it. There's an allegation of sex assault that Mr. Kapuscinski was in the midst of a sex assault of his girlfriend prior to the police arriving. I don't want to get into the details because they sound very bad. They are very bad, aren't they? Without question, your honor. If you listen to these, what's represented in the report, it's bad. And one wonders, how can someone do something like this? You know what, maybe Mr. Kapuscinski, maybe he deserved to die. When I was reading the records, I said, maybe we should just kill people like this if they're assaulting someone. However, we have the law. I mean, police officers cannot just go in and decide on the spot if they think someone is guilty of something and kill them. They didn't mean to kill him. I mean, he got tased in the heart and it did kill him. But there was no intent, was there? One knows if you tase towards the heart, that is a significant risk for causing death. If you dig a little bit deeper in the story, you'll find out that Mr. Kapuscinski himself was sexually assaulted by a police officer when he was a child. In fact, the girlfriend states... The officer didn't know all that when they went in for the interview. Great point, your honor. They didn't know any of this when they came in. Let's get to the heart of the case. You say that your client is on the floor, he's been violent, he's been aggressive. The officer said that he said he was going to kill his girlfriend and then he was also going to kill the officers. I didn't hear that in the audio tape, but that's what they said in their deposition. That's what the officers say in their deposition. Okay, and you didn't refute that, right? We do refute it. If you listen to the audio, you don't hear anything like that. Okay, all right. So you say the audio refutes, or at least doesn't confirm it. Your client's on the ground after a violent attack and at least allegedly threatening the officers. He's on his back. He refuses to allow them to handcuff him because he refuses to turn over on his stomach where he could be safely handcuffed by the officers. Eventually, they tase him. I mean, eventually, just a few seconds because the whole thing happened so fast. What would you have the officers do rather than tase him? Your honor, that's a great question, but that's also the defendant's version of the facts. If you look at the facts favorable to us, that's not exactly what happened. First of all, you have Officer Mitchell in his audio tape statement. He said, you know what? When I walked in, it looked like they were engaged in a sex act. When I talked to the victim afterwards, she said, I was giving oral sex to the guy. The victim was completely calm throughout. She never said, oh my God, he had his legs around me. He was choking me. That is a question of fact. The degree and extent of what was going on is one thing. The other, all right- Were the kids screaming in the audio? I mean, I heard the audio and there's a screaming going on. It's total chaos. Kids are screaming. There's the one child, the girl isn't there. She's screaming. She's saying, don't shoot him. She's screaming because she's afraid of what the cops are going to do. But it's not the girlfriend's voice on the audio at all? No. No. Your honor, there's one- He was strangling the woman with his legs. That's what the cops say. That's what they say in their testimony. But if you look at their state- There's no contrary testimony by anybody because you didn't depose the Christine, I can't recall her last name- The girlfriend. You didn't depose the victim. The girlfriend. No one can find the girlfriend. We have no- All of her statements are all hearsay. Basically, we just had the officer's version and you say, well, their oral statements somehow contradict their sworn deposition statements. Yes. So you say that might create a genuine issue of material facts by their own- But I don't want to lose focus of the main issue here. Why didn't you depose the woman who was allegedly being strangled? You never took her deposition. Your honor, we tried. Why was that? We tried. She cannot be located. Defendants don't have a sworn statement from her either and all of these allegations about what happened to her, it's all inadmissible hearsay anyways. But I don't want to lose focus of the main point here. This case involves two tases. The first tase, let's say they really believed he had his legs around her and he was assaulting her. If you listen to the audio, they say, stop, get off her now. They tase him the first time. Okay, did- Everyone agrees. Tell him to get off her before they tased him? Yes. I thought so. Yes. So he, I mean it went really fast. But anyway, they command him to get off, he doesn't, and they tase him. They tase him. It's effective. He falls down onto the ground onto his back. It's not real effective because if it were effective, he would be totally incapacitated. It was effective in the fact that he got off her, but the effectiveness of the tase is usually it's complete. The guy goes limp. That's the defendant's version of the facts. Our version is, Your Honor, and they admit in their depositions, after the first tase, he falls off the bed, he falls onto the ground on his back. It's undisputed. At that point in time, the girlfriend is out of the room. She is- No, no, no. They tell her to get out of the room. I heard that on the audio. Get out of the room. Get out of the room. And get out of here, I guess is what they say. That's later on. That's in response to a child who was near and was saying something. Oh, it's not to the girlfriend? No, the girlfriend's already out of the room. It's undisputed. After the first tase, the girlfriend is out of the room. After the first tase, Mr. Kapuscinski is on his back. He remains on his back. If you listen to the audio after the first tase, turn over. Turn over. Turn over now. Turn over now. They have a right to handcuff him, to arrest him for assault and battery, do they not? They have a right to arrest him. They do not have a right to do another shot unnecessarily simply because he's not moving. Right, but to arrest him, the proper procedure to do that is to put him on his stomach so his hands go behind his back. Isn't that the standard way to handcuff? That may be. I'm not going to dispute what way to handcuff, but he is sitting there motionless. Turn over. Turn over. Turn over. They say he's trying to get up. They say that. Okay. Except... And there's no evidence to refute that, is there? There is. There's the sworn testimony of Officer Robinson himself. If you listen to the timeline, turn over. Turn over. Turn over. Then you hear a second tase. That's Officer Mitchell's That's the kill shot to the heart. And then a few seconds after that, you hear... To the heart, that suggests that he hadn't turned over, right? Yes. He's still on his back. And then you hear... Is he more dangerous to the police if he hasn't turned over? He's completely nude, unarmed, on his back. I know, but... Answering my question. He's not... He's not if he's... I don't know. We don't know what he's liable to do. It's a little bit hopped up, crazed, or whatever they say. And there's a safer position and a less safe position. This is my question. Sure. There's a safer position and a less safe position. And he's told to get in what the police has reasonably perceived to be a safer position from a police perspective. Can't they tell him to get in that safe position? And if he doesn't, take action? They can tell him to get into any position, and I agree with you there. Well, I'm talking about whether it's safer or not. I think it's safer if you're on your back. I'm thinking of these other cases. There's another case where they said, get out of the car, and the person didn't get out of the car, but there's no indication that in or out of the car was more or less safe. Whereas you have other cases where they say, get down, because they feel like if he gets down, he's not going to be able to shoot them. And so it's safer. So they tell him to get in a safer position. To me, that's the distinct... Well, you don't hear that on the audio. Get in a safer position. If he's not on his back, you can see his arms and hands. No, I know, but that's why I'm asking you. Isn't it obvious that it's a safer position to turn over? Well, if you turn over, a lot of times your hands are hidden. They're underneath you. On your back, you're fully exposed. The crux of this case, though, after the second tase by Mitchell, the kill shot to the heart, you hear Robinson say, roll over right now or I'm going to tase you again. The entire defense to this case is, you know what? We had to tase him the second time because he started to get up to lunge after us. We were just defending ourselves. I agree. If he started to lunge after them, they may have an argument. But I asked Robinson, when you said, now after the second tase, you said, roll over right now or I'm going to tase you again. When you said that, did he already stand up to lunge after you or did you say that before he started to get up? Because I said that before he started to get up. Well, he said that, but he didn't say when he actually tase. By the way, you're out of time unless you want to take additional time. I do want to take additional time, if I may. Sure. If I may. How much more time do you want to take? Three more minutes and I'll save seven for everybody. Three more minutes? All right. I started, I think, by asking you, what would you have the officers do rather than tase them? What would you have them have done here? They could have, if they wanted, they could have cuffed them the way they eventually cuffed them. How would they cuff a resisting, previously violent, aggressive person? How would they do that? The same way they cuffed them in this case. They simply turned them over and cuffed them. Okay. Well, after he was tased in the heart, he was limp. I mean, he was totally passive. You would have officers actually wrestle him, physically wrestle him to turn him over to put the handcuffs on. You think that's the police practice that the Constitution requires here. Is that it? And it's clear to every reasonable officer that if they did anything else, well, if they tased him, your position is it's clearly established if they tased him in this situation that that violated the Constitution and all reasonable officers would know that and therefore could be sued and could have a judgment rendered against them. If he's just laying there, not doing anything else, it is unconstitutional to tase him because he is not actively resisting. We'll decide that, I think. Understood, Your Honor. Is your argument that he should not have been tased or was your argument that he was tased too many times, what's your position on that? He should not have been tased after the first time. The first tase was effective. It separated the two. He fell on the ground, he landed on his back, and he stayed on his back. If you look at the audio. The autopsy report, do you agree with the report? The autopsy report is a little unclear as to how many times the decedent was tased. What do you make of the autopsy report in terms of the number of tasings? The forensic pathologist says he was tased at least twice but even several more times. You see evidence of stun drives being done. The cause of death is due to the second tase to the heart contributed to by the other tasings. You at all rely on a third tasing? I didn't see that in your briefing. We rely on the second. Anything after the first is unnecessary. That's not my question. You could say he was tased a million times but there wouldn't be in the record. I'm trying to get at what you argued because I'm aware of that in the autopsy report. But I didn't pay too much attention to it because you didn't argue it. You argued that the Robinson shot and either did or did not connect and fired two or three more times which either did or did not have a shock go through him. And then there was the Mitchell shot. I didn't see any argument about this third stun drive. You're not relying on that, or you are? Well, we are. Dr. Spitz's affidavit states he notes the other evidence of tasings and he says that contributed to the death in addition to the kill shot to the heart. Thank you. May it please the court. Good morning, Your Honors. Mary Massaran on behalf of the defendant, Apolli, Officer Mitchell, who was from the city of Rockwood. An affirmance is in order here on two grounds. First, the district court correctly held the officer's conduct was constitutionally prohibited. And second, although the district court did not reach this issue, if this court has any doubt about the constitutionality, certainly qualified immunity would serve to protect the officers given this record. You're not representing Robinson, is that your question? No, my colleague is representing Robinson and he'll argue. Are you evil in dividing your time? Yes, we are. I'm sorry I should have said that. All right. Kapuscinski argues this wasn't a serious incident. It wasn't necessary to use this force. And he looks to the Michigan State Police audio to argue that Mitchell described it as a sex act and therefore it wasn't really a serious thing. But Mitchell and Robinson both said the victim was gasping. She appeared to have difficulty breathing. She couldn't talk. Her neck was between Kapuscinski's thighs. He was squeezing to strangle her. And that's clear. And even on the Michigan State Police audio interviewing Mitchell, right after he used the phrase weird sex act, he said he realized it was weird when he, Kapuscinski, said he was going to kill her. The children reported this on 911. Absolutely. What did they report to 911? It's not clear, at least I don't recall the specifics, but that there was violence going on. And when the officers got there, the son was outside, very frightened. He was too frightened even to go back in. The daughter was in the apartment, let the officers in. She was crying, very frightened. It was clear. I understand that argument. I understand the force of it. I'm more concerned about what happens afterwards. Right, right. So let's assume, for argument's sake, that all you say is right. This is a gruesome, awful thing that was being done to the victim. But isn't there some evidence that at the time he was stunned, she was out of the room? She was the first stunned. Is there some evidence that a jury could believe that she was out of the room when he was stunned by Mitchell? That's correct. Okay, so let's assume then that she was out of the room, just because there's some evidence to that effect. Then how is it permissible for him to tase him? What's the rationale? It can't be the harm that was done to Christina because she's out of the room, right? No, but at that point the officers have a right to use force, the intermediate force of a taser, given the severity of the crime and given his... The severity of the crime is very relevant here when she's out of the room. I would say... I'm not grasping that. I can see if he was a threat or if one position was more dangerous than the other and they want to preserve their own safety. But all of those don't relate to how serious the crime was, except maybe indirectly that there was more at stake if he was trying to run away, but he wasn't trying to run away. What I think the officers consistently testified was that he was flailing around, thrashing around. He had a crazed look. Both officers said he was getting up to come at them. Is that enough? You have a person you're trying to arrest and they have a crazed look that you can tase them? I think in the context of this case, absolutely. What is the context? The context is this is someone who is... This is someone who is strong enough and capable enough of inflicting serious, serious violence without a weapon. The officers... Naked to bigger, two bigger officers while he's on the ground? I think absolutely. I'm not saying I believe that. I'm just wondering whether a jury could believe that. Right. No, I don't think a reasonable jury could in this case. Couldn't possibly believe that. Couldn't reasonably believe that. No. I don't believe so. That's my question. Because... Well, let me back up and I'm trying to answer your question. The officers are entitled to use reasonable force. So then the question is could a jury reasonably believe using a taser as opposed to engaging in hand-to-hand combat was reasonable in these circumstances? The officer's officer, Mitchell, testified that Kapuscinski was very muscular. He looked crazed. He was flailing around. He was coming at them. The officers in this case, as in every case, always worry that if they do engage in hand-to-hand combat, particularly with someone who has shown himself to be capable of such violent, physically violent conduct, that their own gun is at risk and that all sorts of unsafe things can happen. Was Kapuscinski from the victim when he, I mean from the, from Kapuscinski when he fired? They're in, and I don't recall the exact dimensions of the room, but they're in a room and there's some feet between them, but not very many. It's a small room as I understand it, so I'm trying to... The greatest amount of distance that a jury could believe was between Mitchell and Kapuscinski? A couple of feet. Two feet? That's what a couple means to me. You're saying he was this far away? I, my recollection... I thought there was something like six feet or something like that, but I... Well, I will defer to your recollection of the dimensions of the room because it wasn't... I thought there was some testimony about how far away he was. There's nothing in there? I didn't think it was six feet. It may have been more than two feet, but I don't, I'm sorry, I apologize. I don't have a specific amount of feet. But I would say they are in close proximity, and under plaintiff's theory they should decrease the space between them and have a hand-to-hand combat with this person who is... You say combat's kind of a colorful word for putting handcuffs on somebody. It involves... In some... And who is on the ground. In some ways. I think the fact that he was naked, yes, it shows he doesn't have a gun, but it doesn't make a fight somehow easier to get handcuffs on him. I don't... I can see the ambiguity. I just wonder which way the ambiguity goes. Well, it seems to me if you look at this court's discussion of tasing over a whole host of cases, the line seems to be on whether the suspect is actively resisting. That's where the court has drawn the line, and that's how the district court drew the line. Is he actively resisting by... He's not following the commands, obviously, but they say he's just being passive down there. They repeatedly give him commands, and I guess he doesn't respond one way or the other. He just doesn't say anything at all, so he's not following them. But is that active resistance or passive resistance? I think it absolutely is, and the district court said the capstone of active resistance was when he was getting up to come at them, and both officers consistently testified that they observed that. So at that point, and keep in mind, we're talking about a period of less than 30 seconds between the first phase and the second phase. Officer Mitchell turns his taser on. When Robinson deploys his, he puts his in safe mode, being very cautious, and then only when the victim starts to come at him does he turn it back on and tase the Kapuscinski again. Could a reasonable juror believe that he hadn't gotten up or at most had gotten up to a crouch? There's no testimony to support that. The officers testify consistently that they thought he was coming at them, and there's no contrary testimony to that. And the victim, the child counsel for the city of Rockwood said they attempted to find her. They could not locate her. Consequently, there isn't any deposition or affidavit. Or you just said somebody else told you they couldn't find her and nobody really did much to obtain her presence. Well, I don't think it's fair to say nobody did much to obtain her presence. I think it is fair to say nobody could locate her.  It is very consistent with what the officer said. She said none of this was consensual. He was acting in a crazed and violent way. That wouldn't be admissible at trial. There's no confrontation. It's an immiscible hearsay. Wouldn't that be excluded at trial? I'm not sure in a civil trial it would be excluded, Your Honor. Certainly in a criminal trial it would. Well, why not? The opposing counsel can't cross-examine her unsworn statement. Let's set that to the side. I'm not sure that it's excludable, but even if it is, what we have is physical evidence that the taser, my client's taser, was on for five seconds, that it was used when both officers said this muscular man with a very crazed expression in his face was getting up, coming at them after he had been given, I think the district court said, 11 verbal commands to turn over into what would have been a safer position so he could be handcuffed. And in that circumstance, the authority from this court, I think, makes clear that amounts to active resistance, and what the officers did was appropriate. This court said in Dickerson you're not obligated to turn to a different method when you're trying to bring somebody under control, and I think that's absolutely true. I'm sorry I'm taking my colleagues' time. Thank you. Thank you. Good morning. May it please the court. Jeff Garish on behalf of Officer Robinson, who's from the city of Gibraltar. All the arguments that Ms. Masseron has asserted apply with equal, if not greater, force to Officer Robinson. There are two theories as against him. The main theory is that he didn't intervene to stop Officer Mitchell. The problem with that is twofold. Number one, he shouldn't have stopped Officer Mitchell. Officer Mitchell did not use excessive force because both Robinson and Mitchell testified repeatedly and consistently that Mr. Kapuscinski was trying to stand up. They were trying to get him to turn over. He was trying to stand up. Officer Mitchell testified to that at least seven or eight times in his deposition starting at page 99. Was it contradicted at all by his oral statement? I have not listened to his oral statement. I've got the depositions, but I saw the oral statements were submitted, but is it contradicted by his oral statement? I don't know. I don't know. I don't think so. I know his deposition. That's all I have to argue is that somehow they contradicted themselves. Right, and his deposition testimony was very consistent. Okay. Well, I'm asking you, are there contradictions between the oral statements of the officers and their deposition testimony? I don't know. You don't know? Well, I don't think so. It depends on how you count. I mean, did he use the exact same words? Probably not. But he testified consistently he was trying to stand up. And he went round and round and round. What do you mean he was trying to stand up? And Officer Mitchell, he couldn't remember exactly his position, but he was face down trying to get up. He either had one foot up. He said that he didn't think he had completely stood up, but he was trying. He's in the process of getting up while he's being told to turn over. So then the question is, is it reasonable or is it excessive force to tase him under those circumstances? We submitted it was not, which is why Ms. Masteron's client shouldn't be held liable. And with regard to Officer Robinson, not only did Officer Mitchell act reasonably, but there was no opportunity for Officer Robinson to have stopped him. According to Plaintiff himself, Officer Mitchell deployed his tase without warning. He just did it. And so the notion that Officer Robinson could have stopped it, had the opportunity, is not so. It's contrary to the evidence. Robinson was, I mean, the two officers are from different police departments. Yes. So they're just really working together because one of them only had one officer on duty or something like that. I think they both just had one officer on duty. So Robinson is not the superior of Mitchell, right? Correct. I think he's deemed to be the officer in charge on the scene because it's his jurisdiction. That's the argument, and I don't have any basis to refute that. But that's why I focus on the fact that he didn't have the opportunity, even if he were deemed to be the superior officer on the scene. Counsel, you just have a little time. I'd like to ask about the other part of the argument against you because all of it's been spent on what Mitchell did. But there's also an argument, as I understand it, but maybe there isn't, that Robinson's continuing to charge the tase or whatever, or having fired later on a stun mode. What's your reaction to those? Sure. Does that even argue? It's certainly not developed. I think he does mention in passing that in addition to not stopping Mitchell, he continued to pull his trigger. The problem with the argument is it wasn't working. The evidence is undisputed that it wasn't working. I thought it was disputed, at least. No. The undisputed evidence showed that there was an initial tase by Robinson. There's no suggestion that that was improper. He acknowledges it. I understand that. So then, after that, they separated. If the two probes had touched the skin, then, as I understand the tasing, you could fire again and it would go through the same probes and create a second shock or a third shock or a fourth shock, and he continued to fire those just on the off chance that maybe they did connect. Yes, right. That's what happened. Right. Okay. But they weren't working. So they don't know what happened to the second probe. There was some suggestion that it went on the girlfriend, and then there was some suggestion that it was the circuit. Either the circuit was completed because one was on her and one was on him and they were touching each other and that caused them to come apart, or he was startled by it and so he let her go and then she left the room. But there was some sort of effectiveness from this. Yes. At least there was some evidence that there was some effectiveness from the initial and maybe even subsequent first charge. I think that's fair. Yeah, there's some evidence. I'm not trying to say that's true. I'm trying to say a jury could possibly find that. The jury could find that the initial deployment of the taser by Robinson was effective. There's evidence of that. Right. If so, subsequent firings would also have had some effect. No, that's the point. After they separated, he tried two more times and they had no effect. The evidence is on both Robinson and Mitchell testified they weren't working because they said if it was working he wouldn't have been able to get up, and yet that's exactly what he was doing. And so Mr. Weglarz asked him why. The argument is it might have worked first, but it could not have worked in the follow-up to the first tasing. Is that right? Exactly. And what about this third set of tasers? Well, there's no evidence of any deployment other than the initial deployment by Robinson and the two subsequent trigger pulls that were having no effect, according to the evidence. Did you just talk about the coroner or the autopsy report or something that says there's evidence of what might have been a stun? You don't even know what I'm talking about. I do. Is this new to you? No, I know what you're talking about. Tell me about it then. Because Robinson and Mitchell both testified they didn't do that. They did not administer a stun gun. They never touched it. No, but there's some evidence. There was some wounds here and there, and so it was thought in the evidence that you're talking about that it was possible that there was a touching of a stun gun to the body, but they both testified they never did that. So there's a conflict in the evidence. Well, there's no admissible evidence that it happened other than the evidence of various marks on his body. Why isn't that admissible evidence? I'm not saying it's right. I'm just trying to understand whether that's something a juror could believe. You say no, but why not? You say there's no evidence except this evidence. That doesn't compute. Well, the wounds don't refute the testimony of both officers that they didn't do that. Because they're not indicative necessarily of a stun gun. It's speculation in that report. That's all it is. But I know my time is up. The other thing that's important to keep in mind is the last trigger pull by Robinson was one second after Mitchell's taste of the heart. So there would have had no impact anyway, and there was no way that he knew that that had happened. They were essentially simultaneously. All this happened very, very quickly, which I think is important to keep in mind. I'm sorry to go over my time. Thank you, Your Honor. Thank you. Andrew Rimbaud? Thank you. Counsel, once the defense of qualified immunity is raised by the defense, it's the plaintiff's burden to disprove qualified immunity. I mean, you agree with that, do you not? Yes. Let me make a couple points. All right. No. Okay. And the qualified immunity, it's a two-prong analysis. First, you have to establish a constitutional violation. The argument's all been whether it's excessive force under the 14th Amendment. The second step, however, that you also have the burden is that it's clearly established law that what they did violated the Constitution and that a reasonable officer would know what they did clearly violated the Constitution. What's the best authority you have to sustain your burden of proving that what they did was clearly established so that all competent officers, all but the incompetent, would know what they did violate in the Constitution? Sure. We put several cases in a brief. First of all, we argue this was never even addressed by the district court. Well, it doesn't matter. It was raised by the defense, was it not? So it's preserved? But there's no ruling that was appealed from federal law. So it doesn't matter. It was raised, preserved, and now they have raised it on their brief, right? The Brown case, to answer your question, Your Honor. Okay. Getting back to preservation. They did preserve the clearly established defense. They argued it in the lower court. I'm just saying the trial judge never addressed it. We see it all the time. But, I mean, we could remand it for Judge Tarnow to make a ruling on it, but it's strictly an issue of law, and I don't really see what benefit we would receive by having Judge Tarnow make a legal ruling.  Can you go to the cases that you're about to see? Yeah, okay. You look at Brown. Brown was a traffic stop case, and it was a very minor, non-serious situation. I mean, our case, and I think the plaintiff there became aggressive and belligerent, but here we have a serious crime of assault and battery, which distinguishes it from Brown, does it not? And also here they can arrest him for assault and battery. They're going to put him in handcuffs. I'm not sure they were going to handcuff him for the traffic violation in Brown. On Brown, we have a traffic stop that was preceded by the plaintiff driving on a highway with no lights on. He then physically fought with the officers, pushed them a couple of times. There's an assault right there, and then he started to run away. He was fleeing. So I don't necessarily agree that that is so factually distinguishable from this case. In fact, the court even said, you know what, if the plaintiff in Brown only stood up and resisted physically and pushed them away a couple of times, it doesn't matter. At the time they tased him, he stopped. We now have passive resistance. We're going to rule in favor of plaintiffs. That kind of sounds like my opinion in Shannonburg versus Wiggin County, does it not? Well, I don't know if I don't think your opinion sided with the plaintiff. I know Brown does. So I'm going to lean a little more heavy on Brown with all due respect. Are you aware of the Shannonburg opinion? I am aware of it. Do I know the specific facts? No, Your Honor. It's basically what you said. The plaintiff there was totally passive. He was on his knees. He was not doing anything, basically. He refused commands of the officers, and they tased him anyway. That's our argument. Then they were placed on notice. Lookit, you can't tase someone who is not engaged in active resistance. Shannonburg wasn't, and that's a published opinion. It's 2019. Judge Rogers is also on the panel. Well, I certainly respect that authority, certainly because you're a part of it, but we also rely on the authorities that we think make it. Okay, there are distinctions in Shannonburg, and Judge Rogers will tell you that. I want to look at these cases and compare them. You say Brown, what else? Brown's the main one. Kent. Brown and Kent. Okay, well, thank you. Thank you. Thank you very much. May I just make one point that I think is the most . . . No, you're out of time. I'm sorry. Okay. Case is submitted. Clerk may call the next case.